**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, AND POPEO, P.C.**
Nada I. Shamonki (SBN 205359)
NIShamonki@mintz.com
Nadia A. Zivkov (SBN 342509)
NAZivkov@mintz.com
2049 Century Park East, Suite 300
Los Angeles, California 90067
Phone: 310-586-3200
Fax: 310-586-3202

**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, AND POPEO, P.C.**
James M. Wodarski (admitted *pro hac vice*)
JWodarski@mintz.com
Scott T. Lashway (admitted *pro hac vice*)
SLashway@mintz.com
Aaron R. Megar (admitted *pro hac vice*)
ARMegar@mintz.com
One Financial Center
Boston, MA 02111
Phone: 617-542-6000
Fax: 617-542-2241

Attorneys for Plaintiff,
MYFREESCORENOW Inc.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MYFREESCORENOW Inc.,<br><br>Plaintiff,<br><br>v.<br><br>CONSUMERDIRECT, Inc.,<br><br>Defendant. | Case No. 8:26-cv-00982 SSS (DFMx)<br><br>**FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Complaint filed: April 24, 2026<br>Trial Date: None Set |

Plaintiff MYFREESCORENOW Inc. ("MFSN"), by its undersigned counsel, hereby complains as follows against defendant ConsumerDirect, Inc. ("ConsumerDirect").

**Nature of the Case**

1. MFSN brings this action against its direct competitor, ConsumerDirect, arising from ConsumerDirect's intentional and persistent disruption of MFSN's business, which is interfering with MFSN's relationships with its customers and affiliates.

2. MFSN and ConsumerDirect had a contractual relationship under which ConsumerDirect hosted MFSN's proprietary customer data on ConsumerDirect's online platform in connection with MFSN's credit monitoring services.

3. Upon information and belief, in an effort to boost its value for a public securities offering, ConsumerDirect unsuccessfully attempted to renegotiate the parties' contractual relationship so that MFSN's customers would be treated as ConsumerDirect's customers and MFSN's customer-based revenue would be recognized as ConsumerDirect's revenue.

4. When MFSN refused to accede to ConsumerDirect's attempts to renegotiate the parties' contract, ConsumerDirect gave MFSN notice that it was terminating the contract. The parties' contractual relationship has since ended, and MFSN has developed a new online platform to continue serving its customers.

5. In the many months following the notice of termination and the subsequent termination of the contract, ConsumerDirect repeatedly refused and has continued to refuse to return MFSN's proprietary customer data, despite MFSN's many requests. As a result, MFSN has been impeded from migrating its existing customers to its new platform.

6. At the same time, ConsumerDirect leveraged its control over MFSN's platform to shut down key features and disrupt MFSN's customers' access to the platform, causing frustration throughout MFSN's customer base and damaging

MFSN's industry reputation.

7. Under the parties' agreement, ConsumerDirect is required to return MFSN's customer data. Despite the clear and unambiguous contract obligations, ConsumerDirect has failed to do so for months. To add insult to injury, ConsumerDirect has also engaged in conduct that has interfered with MFSN's relationships with its customers and affiliates, thereby causing MFSN to lose customers, affiliates, and market share, and to suffer significant damages.

8. By retaining and using MFSN's customer data and otherwise interfering with MFSN's relationships with its customers and affiliates, ConsumerDirect has gained an unfair competitive advantage at MFSN's expense and significantly harmed MFSN.

## **The Parties**

9. MFSN is incorporated in and has its principal place of business in the state of Washington.

10. MFSN provides credit monitoring services. MFSN's customers subscribe to MFSN to get streamlined access to their credit reports and their credit-related information.

11. ConsumerDirect is a Nevada corporation with its principal place of business in Irvine, California.

12. ConsumerDirect also provides credit monitoring services, through its own platform, SmartCredit.com.

## **Jurisdiction and Venue**

13. This Court has jurisdiction under both 28 U.S.C. § 1331 and § 1332(a)(1) because this action arises, in part, under federal law and there is complete diversity of citizenship between MFSN, a Washington corporation with its principal place of business in Washington, and ConsumerDirect, a Nevada corporation with its principal place of business in the state of California, and because the amount in controversy exceeds $75,000.00.

14. This Court has personal jurisdiction over ConsumerDirect because ConsumerDirect has its principal place of business in Irvine, California and because the parties agreed in their Private Label Web Site License and Hosting Agreement ("Agreement," attached hereto as **Exhibit 1**), dated March 8, 2016, that any suits for the enforcement of the Agreement must be brought in Orange County, California. Ex. 1, § 10.12.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because ConsumerDirect's principal place of business is in this District and because the parties agreed in the Agreement that any suits for the enforcement of the Agreement must be brought in Orange County, California. Ex. 1, § 10.12.

## Facts

### MFSN's Credit Monitoring Services

16. MFSN was founded in 2012. MFSN provides credit monitoring services. From April 2016 to February 2026, pursuant to the parties' contract, MFSN utilized a "white label platform" hosted by ConsumerDirect to provide certain components of its credit monitoring services to its customers and affiliates.

17. MFSN's customers contract with and subscribe to MFSN's credit monitoring services by enrolling on MFSN's website and paying a monthly fee to MFSN. MFSN provides customers with email alerts of changes to their credit scores, an online portal to review their credit reports from all three major credit bureaus, and other credit-related information and services.

18. MFSN also contracts with credit consultants, referred to by MFSN as "affiliates." Affiliates are typically professionals in credit and financial education, small business funding, accounting, and tax preparation. Affiliates consult their clients about their credit reports and scores, as well as other credit-related data, but do not provide credit monitoring services. It is therefore necessary for affiliates to be able to review their clients' credit information to provide their services. Under their contracts with MFSN, affiliates refer their clients to MFSN's credit monitoring services and

those clients become customers of MFSN. MFSN, in turn, pays the affiliate a monthly commission for every month that their referred customer is billed by MFSN. Once a customer is enrolled, the customer can provide their credit reports and information to the affiliate through MFSN's credit monitoring services.

19. Some of MFSN's customers enroll directly through MFSN's enrollment page on its website. The majority of MFSN's customers, however, are referred to MFSN by affiliates ("Affiliate-Referred Customer(s)"). Affiliate-Referred Customers enroll in MFSN's credit monitoring services through an enrollment page that is unique and specific to their affiliate. Each affiliate has their own enrollment page that is associated with their affiliate account ("Affiliate Enrollment Page"). When Affiliate-Referred Customers enrolled on the MFSN white label platform hosted by ConsumerDirect via an Affiliate Enrollment Page, the Affiliate-Referred Customer's data was linked with the referring affiliate. The purpose of linking the Affiliate-Referred Customer's data was to provide a way for MFSN, ConsumerDirect, and MFSN's affiliates to track (1) when customers enrolled pursuant to an affiliate referral, and (2) which affiliate referred each customer on the platform.

20. MFSN also provides its affiliates with access to MFSN's affiliate portal. The MFSN affiliate portal is a key function for affiliates, as it allows affiliates access to aggregated data related to their Affiliate-Referred Customers and provides a tracking mechanism for affiliates to monitor their Affiliate-Referred Customers on the MFSN platform.

21. Affiliates are critical to MFSN's business. Affiliates generate and refer approximately eighty percent (80%) of MFSN's customers. Over the last fourteen (14) years, MFSN has developed its affiliate network by investing substantial time and money in (1) advertising and social media campaigns, (2) hosting conferences, events, and trainings, and (3) attending trade shows and other business development meetings. MFSN also updated its white label platform and affiliate portal on multiple occasions to incorporate different tools and functionalities that MFSN's affiliates both

specifically requested and greatly appreciated. In short, MFSN has made substantial monetary and non-monetary investments of its time and business acumen and goodwill in forming and maintaining its relationships with its affiliates.

**MFSN Enters into the Agreement with ConsumerDirect**

22. On March 8, 2016, MFSN entered into the Agreement with ConsumerDirect.

23. ConsumerDirect is MFSN's direct competitor. ConsumerDirect, like MFSN, runs its own competing credit monitoring service through its website SmartCredit.com ("SmartCredit"). Through SmartCredit, ConsumerDirect also enters into contracts with both customers and affiliates.

24. Under the Agreement, ConsumerDirect agreed to provide MFSN a "version of ConsumerDirect's website SmartCredit.com built in a white label format for [MFSN][.]" Ex. 1, § 1.7. The purpose of the Agreement was to provide MFSN with a private label, or white label ("white label"), version of the SmartCredit platform that was branded as an MFSN webpage. MFSN created and managed its own front-end website where individuals would enroll as MFSN's customers, provide their personal and payment information, and subscribe to MFSN's credit monitoring services. MFSN stored each customer's information on the back-end "white label" platform hosted by ConsumerDirect. The customers' information stored on the white label platform would then be used to pull each customer's credit-related data from ConsumerDirect's credit providers, making available each customer's credit reports, credit scores, and other credit information. MFSN's customers could access their credit information on the MFSN white label platform hosted by ConsumerDirect. In consideration for hosting the white label platform, MFSN paid ConsumerDirect a nominal $2.00 per month fee for each of its billed customers enrolled on the white label platform, plus a much larger amount for the credit products purchased by MFSN from ConsumerDirect through the white label platform and provided to MFSN's customers, such as three-bureau credit reports, credit scores, and credit-related alerts.

25. ConsumerDirect was also contractually obligated to provide MFSN access to ConsumerDirect's customer service portal, SupportLink, which MFSN's customer service agents used to provide support to MFSN's customers.

26. The Agreement, which defines MFSN as the "Partner", unambiguously states that (i) MFSN exclusively owns all data and information related to its customers and prospects (defined in the Agreement as "Partner Client's Data" and "Partner Prospect Data"); (ii) ConsumerDirect shall not use the Partner Client's Data other than as reasonably necessary to fulfill its obligations under the Agreement; and (iii) ConsumerDirect shall promptly transfer the Partner Client's Data to MFSN upon the termination of the Agreement:

- Section 6.6. <u>Ownership of Partner Clients and Partner Prospects.</u> Partner shall have exclusive ownership of Partner Clients on ConsumerDirect Systems including all data pertaining to Partner Clients and Partner Prospects including any data including billing data that is necessary for Partner to transition from SmartCredit upon termination and service and bill its Partner Clients. No use of Partner Client's Data or information shall be permitted by ConsumerDirect beyond those contained in this Agreement or reasonably necessary to fulfill ConsumerDirect's obligations to Partner under this Agreement without the express written consent of the parties.

- Section 8.4.1. In the event this Agreement terminates for any reason, Partner will have the option to transfer its Clients to another platform with the full and timely cooperation of Consumer Direct and at no cost to Partner providing the Partner data extracted is limited to the data specified in Schedule E [of the Agreement]. . . . Any extracted Partner data will be provided to Partner within twenty (20) business days of Partner's written request to ConsumerDirect. . . . Following such removal of Partner Clients, Partner shall have no obligation to pay to, or share any revenue with, ConsumerDirect. ConsumerDirect shall take reasonable steps to ensure no transfer takes longer than thirty (30) days from the date of termination. . . . All provisions of this Agreement (including, without limitation, the payment of Applicable Fees) shall remain in effect so long as there are any Partner Clients with subscriptions to the Product and that Partner shall no longer be able to sign up any new Partner Clients for the Product. Upon a Partner Client Transition ConsumerDirect will fully de-enroll all Partner Clients from

all Product features and discontinue any servicing.

27. The Agreement defines "Partner Clients" as "any and all clients of the [white label platform] originating with Partner, whether via phone, Internet-based, or other inquiry and sign-up mediums," Ex. 1, § 1.5; "Partner Prospects" as "any and all customers and visitors to the private label website that may have started the enrollment process to the Product but their enrollment was incomplete, declined by partner, and/or abandoned by the website visitor," Ex. 1, § 1.6; and "Product" as "a version of ConsumerDirect's website SmartCredit built in a white label format for Partner." Ex. 1, § 1.7. In the context of MFSN's business model, "Partner Clients" means both MFSN's customers and affiliates that use the white label platform hosted by ConsumerDirect.

28. Under the Agreement, "ConsumerDirect shall ensure that Partner has the ability at all times to sign up Partner Clients for the Product, and that the Product is available to Partner Clients at all times, in accordance with the standard terms and conditions of ConsumerDirect. 'All times' shall be defined as 98% uptime . . . ." Ex. 1, § 3.1.2.

29. The Agreement also states, in relevant part:

- Section 8.1. <u>Termination Without Cause</u>. Either party may terminate this Agreement upon no less than one hundred twenty (120) days written notice to the other party.

- Section 9.1. <u>Confidentiality</u>. Each party agrees … (i) to hold all of the Confidential Information of any other party in strict confidence, (ii) not to make use of any Confidential Information of the other party in any manner other than for purposes of the Product and this Agreement, including, but not limited to, not using any Confidential Information to market, design, develop or produce products or services or to otherwise compete with the other party in any manner, …. As used in this Agreement, "Confidential Information" means and includes all information, whether verbal or written, disclosed by any party (in such capacity, the "<u>Disclosing Party</u>") to any other party (in such capacity, the "<u>Receiving Party</u>") at any time, and relating to the Disclosing Party's business plans, strategies, financial information, research and

development, marketing, financial models, proposals, techniques, product history and legal history, including without limitation, trade secrets, software, product-design information, client, customer, vendor, and potential investor lists, [and] the identity of any clients or users of the Disclosing Party's products and services….

- Section 9.3. No Adequate Remedy At Law. Each party acknowledges and agrees that due to the unique nature of the Confidential Information of each party, there can be no adequate remedy at law for any breach of its obligations hereunder, that any such breach may allow a party or third parties to unfairly compete with another party resulting in irreparable harm to such party, and, therefore, that upon any such breach or any threat thereof, a party shall be entitled to (a) specific performance and other injunctive relief without the necessity of posting a bond, in addition to whatever remedies it might have at law[.]

- Section 10.1. Partner Client and Partner Prospect Data. Partner Client contact information, IP addresses and other information shared by or gathered with or by ConsumerDirect shall be treated as Confidential Information by ConsumerDirect, but shall not be restricted in any way as to prohibit the fulfillment of this Agreement and obligations post termination of this Agreement. … ConsumerDirect will not remarket, retarget, or otherwise advertise to Partner Clients and Partner Prospects, including without limitation, through SmartCredit.com or 3rd-party offers, by e-mail, phone, or other contact mediums, any product or service offering, including but not limited to housing offers, credit repair offers, credit monitoring offers, credit card offers, and other credit score offers, without the express written consent of Partner.

- Section 10.11. Governing Law. This Agreement, including all matters of construction, validity and performance, shall be governed by the laws of the State of California without giving effect to any conflict of law provisions contained therein.

- Section 10.12. Venue. EACH PARTY AGREES THAT ANY SUIT FOR THE ENFORCEMENT OF THIS AGREEMENT SHALL BE EXCLUSIVELY BROUGHT IN THE COURTS LOCATED IN ORANGE COUNTY, CALIFORNIA.

30. While the Agreement stipulates that MFSN owns "all data pertaining" to its customers, prospective customers, and affiliates, in order for ConsumerDirect to

provide the white label platform, ConsumerDirect required access to MFSN's Customer Data ("Customer Data"), which consists of data, such as full credit card information, contact information (including addresses, phone numbers, and emails), Social Security numbers, birthdays, banking information, and billing and membership history. Upon entering the Agreement, MFSN shared its Customer Data with ConsumerDirect to allow the white label platform to compile and provide access to each customer's credit-related information. Throughout the nine years of the Agreement, MFSN invested substantial time and money in developing its customer network and generating customer enrollment. In turn, ConsumerDirect continued to compile and store Customer Data for all newly enrolled MFSN customers. The Customer Data is a critical asset and highly valuable to MFSN's business, as it allows MFSN to provide credit monitoring services to its customers, bill its customers, and maintain its customers' accounts. Needless to say, the Customer Data has enormous competitive value as well. Any competitor in possession of MFSN's Customer Data could (1) contact and solicit MFSN's customers, and (2) use the customers' enrollment information to efficiently enroll MFSN's customers onto its own platform. MFSN's Customer Data contains highly sensitive and personal information about its customers that is not known to the public and that MFSN would not have shared with ConsumerDirect absent the rights, obligations, and protections provided by the Agreement. Of critical importance, MFSN provided this data based on and in reliance on the parties' Agreement that (1) MFSN exclusively owned the Customer Data, (2) ConsumerDirect would promptly return the Customer Data to MFSN upon termination of the Agreement, and (3) ConsumerDirect was barred and restricted from using the Customer Data for any purpose other than those purposes specifically described and contemplated under the Agreement, namely, hosting the white label platform.

31. Also in furtherance of the purpose of the Agreement and related use of the white label platform, MFSN provided ConsumerDirect with access to highly important, proprietary, and confidential information related to each of its affiliates. Upon entering

the Agreement, MFSN shared data that it had gathered from its affiliates with ConsumerDirect, including each affiliate's business and/or personal names and personal and professional contact information. Throughout the course of the Agreement, as eventually over 10,000 affiliates entered contracts with MFSN, the same information for each new affiliate was also shared with ConsumerDirect under the confidentiality and data security provisions of the Agreement.

32. MFSN's Affiliate-Referred Customers were required to enroll through specific Affiliate Enrollment Pages that were integrated with the white label platform. Customers inputted their information, including their billing information, via their respective Affiliate's Enrollment Page. Pursuant to the Agreement, ConsumerDirect collected MFSN's customer and affiliate data and combined this data to generate metrics that it shared with MFSN. These metrics provided: (1) the ability to track the number of MFSN's customers enrolled with each MFSN affiliate; (2) the amount of revenue generated by MFSN from each affiliate, including which affiliates were most profitable; (3) the number of customers each MFSN affiliate referred to the white label platform; (4) how long each Affiliate-Referred Customer maintained their MFSN subscription; (5) whether each Affiliate-Referred Customer was successfully billed or required a refund or chargeback; and (6) other related confidential and unique metrics pertaining to MFSN's affiliates and customers.

33. ConsumerDirect, having MFSN's confidential affiliate information in hand, and MFSN's confidential data related to affiliate referrals and Affiliate-Referred Customers, calculated MFSN's affiliates' individual performance-related data, such as the number of customers enrolled with each affiliate, revenue generated by each affiliate, referral history, profitability and enrollment activity, the names and quality of each affiliate's referred customers, subscription longevity of referred customers, and monthly metrics detailing each affiliate's number of re-activated accounts, suspended accounts, closed accounts, and new member enrollments. ("Affiliate Data"). The Affiliate Data is of great value to MFSN, and would be to any of MFSN's competitors

(including direct competitor ConsumerDirect), in part because it identifies which of MFSN's affiliates referred the most customers and had the largest customer-networks, and also contains the affiliates' personal contact information that is not publicly available.

**After Over Nine Years of a Successful and Amicable Contractual Relationship, ConsumerDirect Demands MFSN Enter Into an Entirely New Contract**

34. From entering into the Agreement in March 2016 until September 2025, MFSN and ConsumerDirect, despite being direct competitors, maintained a successful and uneventful contractual relationship. Issues rarely arose during this time. MFSN made all payments to ConsumerDirect required under the Agreement, and in exchange, ConsumerDirect made the white label platform accessible and usable for MFSN's customers and affiliates. During that time, MFSN continued to grow its revenue and customer base. As of December 2025, MFSN had over 115,000 enrolled customers and had contractual relationships with over 10,000 affiliates. ConsumerDirect substantially benefited as well. As of December 2025, upon information and belief, ConsumerDirect was receiving over $200,000 in revenue per week from MFSN.

35. The parties' cooperative and successful contractual relationship rapidly changed when ConsumerDirect began considering a public securities offering in September 2025. Upon information and belief, in order to inflate its reported customer base and valuation in preparation for its public offering, ConsumerDirect required a new contract with MFSN that would enable it to convert MFSN's customers into its own customers and book MFSN's customer-based revenue as its own. Upon information and belief, ConsumerDirect concocted a pretext to force MFSN into a new contract that would allow ConsumerDirect to achieve its goals. To that end, ConsumerDirect informed MFSN that it would require MFSN to enter into a new contract that would replace the Agreement. At first, discussions of the new contract were amicable. Upon information and belief, in order to justify the need for a new contract, ConsumerDirect explained that because MFSN was such a significant source

of its revenue, ConsumerDirect would be required to attach any agreement with MFSN to its S-1 registration statement when submitting its public filings. ConsumerDirect inferred that certain purported data-privacy issues may be flagged in the Agreement and expressed concern that MFSN's policy disclosures needed to be "compliant" if they were to be attached to the S-1. This surprised MFSN, because there had been no data privacy or compliance issues and no such issues had ever been raised during the parties' 9-year contractual relationship. Nonetheless, MFSN agreed to review the proposed new contract, while also offering to simply amend the existing Agreement to address ConsumerDirect's compliance-related concerns.

36. To MFSN's surprise, ConsumerDirect sought to change much more than the data privacy provisions in the Agreement. The proposed new contract included multiple new business terms that sharply deviated from the terms of the Agreement.

37. Specifically, the proposed new contract included four (4) new business terms that presented a significant and troubling departure from the Agreement. First, ConsumerDirect sought to recognize all revenue generated from MFSN customer enrollment as its own revenue, and then pay MFSN a share of that revenue minus the incurred cost of ConsumerDirect's contracted-for services. As a result of this change, MFSN would be paid monthly by ConsumerDirect as opposed to upon payment by its customers. Second, ConsumerDirect's proposed new contract included a provision stating that in the event MFSN was not able to service its customers, those customers would automatically be serviced by SmartCredit. Third, ConsumerDirect requested to make the contractual relationship with ConsumerDirect exclusive, with certain minor exceptions; the Agreement was not exclusive. Fourth, ConsumerDirect required MFSN to enter into a three-year term, which removed MFSN's right to terminate for cause.

**<u>MFSN's Good-Faith Negotiations Regarding the Proposed New Contract Reveal ConsumerDirect's True Intentions</u>**

38. Despite its surprise and frustration with ConsumerDirect's newly proposed business terms, MFSN engaged in good-faith negotiations regarding the

proposed new contract. MFSN met with ConsumerDirect several times throughout October 2025 to discuss the proposed new contract. During those discussions, MFSN made clear its willingness to address ConsumerDirect's expressed regulatory and compliance concerns that purportedly were what necessitated the proposed new contract. But it became quickly apparent that ConsumerDirect cared much more about the new restrictive business terms in the proposed contract, because they provided ConsumerDirect with the means to ensure MFSN would remain in partnership with ConsumerDirect leading up to its public offering and would allow ConsumerDirect to recognize MFSN's revenue as its own. MFSN further affirmed its suspicions of ConsumerDirect's true intentions when ConsumerDirect revealed during negotiations that it knew MFSN was developing its own proprietary back-end website and securing a new credit data provider, which would allow MFSN to provide its credit monitoring services without ConsumerDirect's white label platform.

39. To reach a reasonable compromise with its long-time business partner, MFSN proposed that the parties work on an interim agreement to address ConsumerDirect's regulatory and compliance concerns. ConsumerDirect initially indicated it might be amenable to that solution but ultimately rejected MFSN's proposal.

**ConsumerDirect Gives Notice It Will Terminate the Agreement**

40. On October 30, 2025, ConsumerDirect's outside counsel delivered a letter stating that ConsumerDirect was invoking its right to terminate without cause, which would terminate the Agreement on February 28, 2026, unless MFSN capitulated to ConsumerDirect's new contractual terms by December 1, 2025.

41. The letter then went a step further, alleging for the first time in the parties 9-year relationship that MFSN had purportedly breached the Agreement because MFSN's landing page did not refer to ConsumerDirect's Terms of Use, Service Agreement, and Privacy Policies (collectively, "ConsumerDirect Policies"). Because of this alleged breach, ConsumerDirect stated that it intended to invoke its right to

terminate *with cause*, pursuant to Section 8.3.3 of the Agreement, if MFSN did not cure the alleged breach by November 29, 2025. Throughout the parties' entire contractual relationship, MFSN's landing page never referred to or connected customers with the ConsumerDirect Policies. During the entirety of the parties' contractual relationship until receipt of the October 30, 2025 letter, ConsumerDirect never suggested this omission was a breach of the Agreement or raised any other issue or concern. This is not surprising because Schedule G of the Agreement explicitly states that including the ConsumerDirect Policies on the MFSN-branded platform was "optional."

42. MFSN disagreed with ConsumerDirect's accusation that MFSN had breached the Agreement. Nonetheless, on November 5, 2025, MFSN's outside counsel delivered a letter stating that, despite MFSN's belief that it had not breached the Agreement, MFSN had updated its landing page to address ConsumerDirect's concern.

43. ConsumerDirect never followed up on its purported intent to terminate for cause.

**<u>Once Contract Negotiations Reach a Clear Impasse, ConsumerDirect Deploys Coercive and Retaliatory Tactics Against MFSN</u>**

44. By the latter half of November 2025, contract negotiations had stalled. ConsumerDirect was unwilling to discuss amending the Agreement or reaching an interim agreement that would address its original regulatory and compliance concerns. MFSN was unwilling to agree to the restrictive and onerous business and commercial terms that ConsumerDirect was demanding with the new proposed agreement. As the December 1, 2025 deadline approached, ConsumerDirect became increasingly insistent that MFSN sign the new proposed contract, but MFSN continued to refuse.

45. On December 1, 2025, the new proposed contract remained unsigned and the Agreement, set to terminate on February 28, 2026, continued to govern. ConsumerDirect immediately launched a retaliatory campaign of coercive sabotage designed to either force MFSN to capitulate to ConsumerDirect's demands or destroy MFSN's business entirely. Upon information and belief, ConsumerDirect's scheme

had a simple but devastating logic: poison MFSN's relationships with and reputation among its customers and affiliates by disrupting their access to MFSN's services, then divert those customers and affiliates to ConsumerDirect itself while MFSN was powerless to respond.

46. On December 1, 2025, ConsumerDirect weaponized its control over the white label platform by forcing all of MFSN's enrolled customers to reset their passwords. Without any advance notice to MFSN, MFSN's customers received an automatic alert requiring that they reset their passwords in order to regain access to MFSN's platform. This was the first time in MFSN's entire 9-year contractual relationship with ConsumerDirect that ConsumerDirect required all of MFSN's customers to reset their passwords. ConsumerDirect also required that MFSN's customers enter their Social Security numbers and answer security questions when resetting their passwords—an arduous and intimidating process designed, upon information and belief, to frustrate and alarm customers. On information and belief, SmartCredit customers were not required to reset their passwords at that time. Upon information and belief, this different treatment of MFSN's customers was deliberately intended by ConsumerDirect to poison MFSN's customer relationships while protecting its own.

47. The negative and harmful effects to MFSN of ConsumerDirect's tactic were immediate and devastating. MFSN receives no more than 600 customer service calls on a typical day. On December 1, 2025, in response to ConsumerDirect's maneuver, MFSN received 1,220 customer service calls, which increased to more than 8,000 over the next three days. The call volume was so overwhelming that MFSN was unable to connect with a large percentage of its customers, and, as a result, a significant number of customers canceled their subscriptions and demanded refunds. Upon information and belief, many of these customers had subscribed to MFSN's services specifically to monitor and improve their credit, and the forced password reset—which also required customers to re-enter their Social Security numbers and answer security

questions through a lengthy process—denied those customers access to the credit monitoring tools they were paying for and relying upon to achieve their financial goals. Upon information and belief, ConsumerDirect knew or reasonably should have known that the forced password reset would cause MFSN's customers to blame MFSN and terminate their relationships with MFSN.

48. By forcing all of MFSN's customers to reset their passwords and re-enter their personal and confidential information, ConsumerDirect also poisoned MFSN's relationships with its affiliates. Through its affiliate portal, MFSN provides a critical tool for affiliates where, upon affirmative consent from their MFSN customers, affiliates can log in to the MFSN white label platform and use their customers' passwords to directly access and analyze customers' credit reports. If a customer resets their password, the new password does not automatically regenerate for the affiliate (i.e., the affiliate does not automatically receive the new password). ConsumerDirect's forced password reset maneuver made this tool unusable and, upon information and belief, made it nearly impossible for affiliates to service their customers on the MFSN white label platform. Upon information and belief, as a result, customers who had engaged affiliates to help them understand and improve their credit were unable to receive those services—through no fault of their own and based on ConsumerDirect's manufactured security pretexts. Affiliates immediately expressed significant frustrations to MFSN's customer service team and several terminated or reduced their relationships with MFSN. Upon information and belief, ConsumerDirect then exploited the very frustration it had caused to recruit MFSN's affiliates for its own SmartCredit platform.

49. To make matters worse, beginning on December 2, 2025, ConsumerDirect disabled MFSN's affiliates' external login APIs related to third-party software that affiliates rely on to process their customers' information. Upon information and belief, this maneuver caused a major disruption among MFSN's affiliates, who require access to these third-party software programs to provide service to their customers. Like

ConsumerDirect's forced password reset, upon information and belief, this maneuver caused great frustration across MFSN's affiliates and drove many to direct their customers to ConsumerDirect and other platforms. In short, ConsumerDirect's deliberate sabotage of MFSN's platform poisoned MFSN's relationships with many of its affiliates and enabled ConsumerDirect to divert those affiliates to itself.

50. ConsumerDirect also disabled MFSN's ability to provide customer support to its customers via SupportLink—yet another deliberate maneuver designed, upon information and belief, to frustrate MFSN's customers and affiliates and poison their relationships with MFSN. ConsumerDirect further compounded the harm by instituting a second forced password reset for some MFSN customers on January 3, 2026.

51. Around this time, ConsumerDirect announced that no new enrollments would be processed on the MFSN white label platform beginning on February 28, 2026. ConsumerDirect made no mention of the fact that MFSN was launching a new platform that would be available to customers after February 28, 2026. Upon information and belief, ConsumerDirect's intentionally vague announcement was intended to suggest that MFSN's business was shutting down, particularly in light of the disruptions that ConsumerDirect caused in the days prior.

52. Each of these actions taken by ConsumerDirect through its control over MFSN's white label platform and related programs caused significant frustration, stress, and disappointment across MFSN's customer and affiliate base. ConsumerDirect at no point provided a legitimate basis for any of these maneuvers. Upon information and belief, ConsumerDirect's actions were intended solely to sabotage MFSN's business, poison MFSN's relationships with its customers and affiliates, create an opportunity for ConsumerDirect to misappropriate MFSN's customers and affiliates, and drive MFSN out of the credit monitoring market.

53. Further, on December 1, 2025, without notice to or consent from MFSN, ConsumerDirect unilaterally imposed an entirely new Terms of Use disclosure on the

MFSN white label webpage. The new Terms of Use required that all of the enrolled MFSN customers agree to ConsumerDirect's Terms of Use when signing up to become a MFSN customer, and all current customers were provided notice via email that their membership was now governed by ConsumerDirect's new Terms of Use. ConsumerDirect also removed MFSN's Terms of Use from the white label webpage. In effect, per ConsumerDirect's new Terms of Use, MFSN's new and existing customers were now forced to agree to becoming ConsumerDirect's customers—effectively taking MFSN's customers through unilateral action and accomplishing the goals that ConsumerDirect could not achieve through negotiation.

**<u>ConsumerDirect Alleges—and MFSN Remediates—a Variety of Baseless Data Security Concerns to Justify its Disruptions of MFSN's White Label Platform</u>**

54. Following its multiple maneuvers to disrupt MFSN's customers' and affiliates' use of the MFSN platform, ConsumerDirect delivered MFSN an ultimatum: ConsumerDirect would continue what it described as its "preventative security measures" until MFSN produced a third-party attestation from a "reputable" data security firm confirming MFSN maintained sufficient data security. To preserve its relationships with its customers and affiliates and curtail the significant harm caused by ConsumerDirect's bad faith actions, MFSN quickly acquiesced and agreed to engage and paid for a reputable security firm that ConsumerDirect specifically recommended, Kroll Associates, Inc. ("Kroll").

55. In that same time frame, ConsumerDirect presented MFSN with a long list of security concerns that it claimed—after 9 years of working together cooperatively—to identify for the first time on the MFSN platform. Not surprisingly, MFSN found ConsumerDirect's purported concerns were baseless pretexts manufactured, upon information and belief, to justify ConsumerDirect's ongoing assault on MFSN's business. Nonetheless, consistent with its efforts to preserve its relationships with its customers and affiliates and curtail the significant harm caused by ConsumerDirect's bad faith actions, and to preserve its relationship with

ConsumerDirect, MFSN worked on an ongoing basis to address ConsumerDirect's purported concerns and implement additional security measures. Each time MFSN provided evidence that it fixed a purported security issue, ConsumerDirect would present new concerns. This resulted in a seemingly never-ending cycle of security demands designed, upon information and belief, to string MFSN along while ConsumerDirect systematically took steps to harm MFSN's credit monitoring business by poisoning its customer and affiliate relationships and undermining MFSN's industry-wide reputation. ConsumerDirect's pattern of conduct continued throughout December 2025 and into the new year. Without any meaningful alternative to immediately and effectively curtail the harm caused to MFSN by ConsumerDirect's maneuvers, MFSN acquiesced to each of ConsumerDirect's baseless security demands.

56. In furtherance of its efforts to curtail the significant harm caused by ConsumerDirect's maneuvers, MFSN continued to engage Kroll and to update ConsumerDirect regarding its engagement. In late December, MFSN shared a draft Statement of Work ("SOW") with ConsumerDirect that detailed Kroll's project plan. On December 30, 2025 and in the middle of the winter holidays, ConsumerDirect raised certain concerns with the details of the Kroll engagement itself. Continuing to act in good faith and to mitigate and curtail the harm caused by ConsumerDirect's maneuvers, MFSN provided ConsumerDirect with an updated Kroll SOW that addressed ConsumerDirect's concerns.

57. A month later, Kroll delivered its report, which validated MFSN's understanding that its platform did not create any genuine or meaningful security concerns. The Kroll report stated that MFSN had only two "info" level vulnerabilities and no other vulnerabilities, and all test cases identified by Kroll had been remediated.

**<u>ConsumerDirect Refuses to Transfer MFSN's Customer Data and Takes Steps to Disrupt Customer Enrollment on MFSN's New Platform</u>**

58. On January 7, 2026, MFSN notified ConsumerDirect that, in light of ConsumerDirect's notice of termination (effective February 28, 2026), it would be

exercising its rights under Section 8.4.1 of the Agreement and requiring that ConsumerDirect return MFSN's Customer Data by or before the date the Agreement terminated.

59. At this point, it was known by both parties that MFSN was preparing to launch its own platform before the Agreement terminated on February 28, 2026. In order to effectively transfer its customers and affiliates onto its new platform, MFSN needed the data described in Section 8.4.1 and Schedule E of the Agreement, which largely included customers' personal and payment information.

60. On January 13, 2026, MFSN provided its formal demand that ConsumerDirect return MFSN's Customer Data pursuant to Section 8.4.1 of the Agreement. MFSN confirmed that, pursuant to Section 8.4.1, ConsumerDirect was required to provide the Customer Data within twenty (20) days.

61. MFSN's Customer Data was and is essential to MFSN's transition to its independent platform. The Customer Data was and is required to migrate MFSN's customers to the new platform and allow its new platform to access the customers' credit-related data without requiring that customers re-enter all of their information on the new platform. MFSN's receipt of the Customer Data would enable MFSN to pre-populate all of the necessary customer information for each of its customers and was intended to enable a seamless transition. With the return of the Customer Data to MFSN, when MFSN customers needed to access their credit information on the new platform, they would only be required to agree to a "one click" consent upon logging onto their MFSN accounts. Business continuity would also be preserved as MFSN would continue to bill its customers' monthly subscription fees without interruption. Further, it was imperative to MFSN's affiliates that MFSN's customers be efficiently transitioned onto the new platform, in order to ensure that affiliates could continue to service their clients on MFSN's new platform.

62. Initially, ConsumerDirect appeared receptive to complying with its obligations under Section 8.4.1 of the Agreement and cooperating with MFSN's

request. But as the month went on, MFSN realized that ConsumerDirect had no intention of complying with its obligations under Section 8.4.1 of the Agreement. Indeed, ConsumerDirect ignored MFSN's ongoing requests for the return of the Customer Data and—despite the Agreement terminating at the end of February—no data transfer plan was in place by February 1, 2026.

63. Importantly, Section 8.4.1 requires ConsumerDirect to transfer the requested data within twenty (20) days of MFSN's formal request. Nonetheless, ConsumerDirect failed to comply with this requirement, because no transfer had occurred by February 2, 2026.

64. Finally, on February 3, 2026—one day after ConsumerDirect was required to transfer the Customer Data to MFSN—ConsumerDirect formally responded to MFSN's data transfer request. Communicating now through a new group of attorneys, ConsumerDirect once again raised fabricated and bad faith data security concerns, this time in regard to the new MFSN platform, and claimed it could not complete the requested transfer until such concerns were addressed. ConsumerDirect also demanded that MFSN provide an additional third-party attestation, either from Kroll or a new security firm, confirming that MFSN's data security practices on the new platform met an industry standard (PCI-DSS Level 1) even though that standard does not apply to MFSN. Because of a lower transaction volume, MFSN is subject to PCI-DSS Level 2, not PCI-DSS Level 1, and MFSN complies with the PCI-DSS Level 2 standard.

65. Over the next two months, the now familiar pattern continued. In a desperate effort to mitigate and curtail the harm caused by ConsumerDirect's maneuvers, and now also desperate for the return of its Customer Data to ensure a stable transition to the new platform, MFSN responded to each of ConsumerDirect's baseless security concerns with explanations, and often evidence, showing that the concerns were unfounded but nonetheless had been addressed. In response, ConsumerDirect would raise additional purported concerns and, upon information and

belief, used those newly manufactured concerns as a pretext to justify its refusal to comply with Section 8.4.1 of the Agreement. ConsumerDirect strung MFSN along for months, always dangling the prospect of returning MFSN's Customer Data—all while ConsumerDirect continued to misappropriate MFSN's customers and affiliates and erode MFSN's business and competitive position.

66. MFSN offered to reduce the number of data fields that it had previously requested and even requested that the Customer Data be initially transferred from ConsumerDirect to a separate secure server, not MFSN. At every opportunity, ConsumerDirect maintained its bad faith refusal to transfer MFSN's Customer Data to either MFSN or a secure server. In short, ConsumerDirect refused to give up its possession of the MFSN Customer Data, directly in violation of the terms of the Agreement, including, but not limited to, Section 8.4.1.

67. Continuing in its efforts to mitigate and curtail the harm caused by ConsumerDirect's bad faith actions, MFSN offered to host a meeting between the parties to work through the alleged security issues. MFSN also asked ConsumerDirect to provide evidence of the security issues purportedly identified on the new MFSN platform. ConsumerDirect was largely unresponsive to these requests while continuing to raise new security concerns to justify its refusal to transfer the Customer Data.

68. Now aware that MFSN customers were going to be moving to MFSN's new platform, ConsumerDirect also began leveraging its control over the MFSN white label platform to disrupt the transition of MFSN's customers to MFSN's new platform.

69. For example, ConsumerDirect permanently closed over 5,000 MFSN customer accounts without providing a viable way for MFSN to re-enroll those customers.

70. The Agreement requires that ConsumerDirect cooperate in the transition of MFSN's customers to its new platform. Rather than cooperating, ConsumerDirect refused to assist in canceling MFSN's white label customer accounts and also disabled MFSN's own ability to cancel those accounts. MFSN's customers' only option was to

follow ConsumerDirect's arduous twelve-step cancellation process for white label customers. MFSN notified ConsumerDirect that this arduous cancelation process would likely cause MFSN to lose customers, because, to avoid double-billing, MFSN could not start billing customers on the new platform until their white label subscriptions were cancelled. MFSN requested ConsumerDirect streamline and fix the cancellation process, but ConsumerDirect refused.

71. To make matters even worse, ConsumerDirect then implemented a "cancellation notice" on MFSN's white label platform that, upon information and belief, was intentionally designed to poison MFSN's customer relationships and divert MFSN's customers to ConsumerDirect. When MFSN customers canceled their white label accounts, those customers received an email, containing MFSN branding and logos, that falsely suggested that enrolling in MFSN's new platform was inherently risky and encouraged customers to instead enroll with SmartCredit by advising that the customers would lose access to certain features on the white label platform. Upon information and belief, this deceptive communication was designed to convert MFSN's customers into ConsumerDirect customers by spreading fear and misinformation. Prior to 2026, the white label's cancellation notice was a one-sentence email consisting solely of a confirmation of cancellation and reference number.

72. Additionally, after MFSN requested the return of its Customer Data, ConsumerDirect began improperly using MFSN's Customer Data and Affiliate Data to solicit MFSN's affiliates and customers. ConsumerDirect has used the Customer Data and Affiliate Data to (1) directly contact MFSN's customers, and (2) directly solicit MFSN's affiliates in an effort to misappropriate some of MFSN's most valuable affiliates and poach their customer. Upon information and belief, in order to persuade MFSN's affiliates to direct business to SmartCredit, ConsumerDirect promises a more stable platform, essentially suggesting that a transition to SmartCredit would avoid the same exact disruptions that ConsumerDirect itself caused on the MFSN white label platform and is causing to MFSN's customer transition.

73. Upon information and belief, ConsumerDirect, through its agent, has launched a social media campaign targeted at disparaging MFSN.

74. Whether because of messages received from ConsumerDirect or otherwise due to the disruptions caused by ConsumerDirect, ConsumerDirect's maneuvers have significantly harmed MFSN. As a result of ConsumerDirect's maneuvers, MFSN's affiliates have expressed their frustrations to MFSN, and multiple MFSN affiliate relationships—the lifeblood of its business—have been poisoned. Affiliates have even explicitly told MFSN that they are transitioning their customers to other platforms because of the disruptions that were caused by ConsumerDirect's refusal to return MFSN's Customer Data and the forced password resets and other unilateral measures that rendered the platform unusable.

**<u>MFSN Makes Final Offer to Provide Kroll Executive Summary, and ConsumerDirect Ultimately Declines to Review</u>**

75. On March 24, 2026, ConsumerDirect continued to maintain that it would not transfer MFSN's data until it was provided with a proper attestation regarding MFSN's security measures. The next day, MFSN informed ConsumerDirect that Kroll had completed its testing of the new MFSN platform, and that MFSN was prepared to share with ConsumerDirect an executive summary of Kroll's report as soon as ConsumerDirect signed Kroll's non-reliance agreement.

76. In April 2026, MFSN requested that ConsumerDirect sign the required non-reliance agreement so that it could share with ConsumerDirect the Kroll report. To date, ConsumerDirect has not signed the non-reliance agreement.

77. The Kroll executive summary states that it identified only two "low" level issues on the MFSN platform, which demonstrated adequate data security. Notwithstanding the Kroll report's favorable findings regarding the MFSN platform's security, ConsumerDirect has continued to refuse to return the Customer Data.

**MFSN has been Significantly Harmed and Will Continue to Be Significantly Harmed by ConsumerDirect's Bad Faith Actions**

78. Despite ConsumerDirect's attempts to derail the launch of MFSN's new platform, and due to MFSN's endless efforts to overcome ConsumerDirect's disruptions, the new platform launch has been relatively successful. However, ConsumerDirect's refusal to return MFSN's Customer Data and efforts to poison its customer and affiliate relationships have still deprived MFSN of a large quantity of customers and revenue and negatively impacted the new platform's success. For example, MFSN has only retained 30% of its customers from the white label platform, largely because ConsumerDirect's maneuvers have deprived MFSN of its Customer Data. Upon information and belief, ConsumerDirect has misappropriated a significant portion of MFSN's customer base through its maneuvers. MFSN had over 115,000 customers on its white label platform in December 2025. As of April 13, 2026, around 70,000 MFSN customers remained stranded on the white label platform—held hostage by ConsumerDirect—notwithstanding MFSN's desire, intent, and repeated attempts to transition those customers to its new platform. Indeed, approximately 21,000 MFSN white label customers started enrolling on the new platform but did not finish the enrollment process, upon information and belief, directly as a result of ConsumerDirect's maneuvers. Specifically, ConsumerDirect (1) implemented multiple obstacles to prevent white label customers from canceling, (2) has prevented MFSN from efficiently offering its new platform to its white label customers by holding MFSN's Customer Data hostage, and (3) discouraged MFSN's customers from canceling their white label accounts by lodging false concerns about the new platform.

79. The effect that ConsumerDirect's maneuvers has had on MFSN's affiliate base is equally devastating—10 of MFSN's top 50 affiliates have been poached by ConsumerDirect or have otherwise ceased doing business with MFSN, and MFSN received 30% fewer referrals in Quarter One of 2026 than it did in Quarter Four of 2025. ConsumerDirect has poisoned relationships that MFSN spent fourteen years

cultivating.

80. Upon information and belief, ConsumerDirect's intentions are unmistakable: destroy its major competitor, MFSN, so ConsumerDirect's product, SmartCredit, can dominate the credit monitoring services market and ConsumerDirect can inflate its valuation for its anticipated public offering.

81. ConsumerDirect's refusal to return MFSN's data further harmed MFSN because it caused MFSN to issue more than 4,000 refunds to customers, totaling over $100,000. The amount of refunds MFSN issued in March 2026 was 240% greater than those issued in February 2026.

82. The harm ConsumerDirect's actions have already caused and will cause in the future is irreparable and incalculable and cannot be cured solely by monetary damages.

**FIRST CAUSE OF ACTION**

**Breach of Contract**

83. MFSN repeats and realleges each and every allegation in Paragraphs 1 to 82 above as if fully set forth herein.

84. California law governs MFSN's breach of contract claim by virtue of the Agreement's choice-of-law provision. *See* Ex. 1 § 10.11.

85. The Agreement is a valid and binding contract, signed by both parties on March 8, 2016, and is supported by valid and adequate consideration.

86. MFSN has performed all its obligations under the Agreement and complied with its terms through the date of its termination on February 28, 2026.

87. Pursuant to the Agreement, MFSN has paid ConsumerDirect the total amounts due thereunder.

88. Section 8.4.1 of the Agreement requires, in relevant part, "[i]n the event this Agreement terminates for any reason, [MFSN] will have the option to transfer its Clients to another platform with the full and timely cooperation of Consumer Direct and at no cost to [MFSN] providing the [MFSN] data extracted is limited to the data

specified in Schedule E [of the Agreement]. . . . Any extracted [MFSN] data will be provided to [MFSN] within twenty (20) business days of [MFSN's] written request to ConsumerDirect."

89. ConsumerDirect invoked its right to terminate the Agreement without cause, effective February 28, 2026.

90. On January 13, 2026, MFSN formally requested, pursuant to the upcoming termination of the Agreement, that ConsumerDirect return to MFSN its Customer Data within twenty (20) days of its request.

91. ConsumerDirect failed to return the requested data to MFSN within twenty (20) days of MFSN's request, and failed to cooperate with MFSN.

92. As of the date of this Complaint, ConsumerDirect still has not returned the requested data to MFSN.

93. ConsumerDirect is therefore in breach of Section 8.4.1 of the Agreement.

94. Section 6.6 provides, "No use of [MFSN] Client's Data or information shall be permitted by ConsumerDirect beyond those contained in this Agreement or reasonably necessary to fulfill ConsumerDirect's obligations to [MFSN] under this Agreement without the express written consent of the parties."

95. ConsumerDirect has used and continues to use MFSN's Client Data to contact MFSN's customers, dissuade them from enrolling in MFSN's new platform, and attempt to coerce or convince them to enroll with ConsumerDirect's service.

96. ConsumerDirect would not be able to contact MFSN's customers if it did not have and use MFSN's Customer Data.

97. ConsumerDirect is therefore in breach of Section 6.6 of the Agreement.

98. Section 9.1 prohibits both parties from using the "Confidential Information" of the other party, in relevant part, "to market, design, develop or produce products or services or to otherwise compete with the other party in any manner."

99. Under Section 9.1, "Confidential Information" means, in relevant part, "all information … disclosed by any party … to any other party … relating to the

Disclosing Party's business plans, strategies, financial information, research and development, marketing, financial models, proposals, techniques, product history and legal history including, without limitation, trade secrets, … client, customer, vendor and potential investor lists, [and] the identity of any clients or users of the Disclosing Party's products and services[.]"

100. MFSN's Customer Data, Affiliate Data, and all metrics and information generated from MFSN's white label platform therefore constitute "Confidential Information" under the Agreement.

101. ConsumerDirect has used and continues to use MFSN's Confidential Information, to contact MFSN's customers and affiliates and dissuade them from enrolling in MFSN's new platform or referring their clients to enroll with MFSN. ConsumerDirect has further used MFSN's Confidential Information to promote its SmartCredit product to MFSN's customers and affiliates. ConsumerDirect's use of MFSN's Confidential Information "to market, design, develop or produce products or services or to otherwise compete with the other party in any manner" is a breach of Section 9.1.

102. Section 3.1.2 requires that "ConsumerDirect shall ensure that [MFSN] has the ability at all times to sign up [MFSN] Clients for the Product, and that the Product is available to [MFSN] Clients at all times, in accordance with the standard terms and conditions of ConsumerDirect." "All times" is defined as "98% uptime" subject to limited exceptions.

103. ConsumerDirect prevented both MFSN's customers and affiliates from using the MFSN white label platform on multiple occasions and for extended periods of time. For example, ConsumerDirect rendered the platform largely unusable for customers and affiliates when it instituted multiple forced password resets across MFSN's customer base. ConsumerDirect also rendered the platform largely unusable for MFSN's affiliates when it disabled the external login APIs that allowed MFSN's affiliates to use third-party software in connection with the MFSN white label platform.

ConsumerDirect also disabled MFSN's access to the SupportLink customer service platform.

104. ConsumerDirect is therefore in breach of Section 3.1.2 of the Agreement.

105. MFSN has been significantly damaged by ConsumerDirect's breaches in an amount to be determined at trial.

106. MFSN has suffered and will continue to suffer irreparable and incalculable harm that cannot be cured solely by monetary damages because of ConsumerDirect's breaches, which have caused and will continue to cause MFSN a loss of goodwill and reputation, and a substantial loss of business.

## SECOND CAUSE OF ACTION

## Breach of the Implied Covenant of Good Faith and Fair Dealing

107. MFSN repeats and realleges each and every allegation in Paragraphs 1 to 82 above as if fully set forth herein.

108. Section 8.4.1 of the Agreement expressly contemplates that, upon the termination of the Agreement, MFSN is permitted to transfer its data onto a different platform for the purpose of continuing to operate its credit monitoring services.

109. ConsumerDirect has taken various steps to inhibit MFSN from migrating its customers onto its new platform in breach of its duty of good faith and fair dealing. Those steps include, but are not limited to, instituting obstacles to prevent white label customers from canceling their accounts, soliciting customers to subscribe with SmartCredit instead of MFSN's new platform, and refusing to return to MFSN its Customer Data.

110. The purpose of the Agreement was to provide a means by which MFSN could service its customers under MFSN's own domain name. As set forth in its preamble, the purpose was for "MFSN to offer certain products and services of ConsumerDirect's SmartCredit.com to [MFSN]'s Clients . . . in a white label version of SmartCredit.com, and [for] ConsumerDirect . . . to and have such services offered and provided to the [MFSN] Clients under [MFSN's] domain name."

111. Through its ongoing and repeated efforts to disrupt MFSN's business, including by interfering with—and in some instances wholly preventing—MFSN's affiliates' and customers' use of the MFSN white label platform, and then further by preventing MFSN customers from continuing to receive MFSN's services via MFSN's domain name, ConsumerDirect has frustrated the stated purpose of the Agreement and has therefore breached its duty of good faith and fair dealing.

112. MFSN has been damaged by ConsumerDirect's breaches of the implied covenant of good faith and fair dealing in the Agreement in an amount to be determined at trial.

113. MFSN has suffered and will continue to suffer irreparable and incalculable harm that cannot be cured solely by monetary damages because of ConsumerDirect's breaches of the implied covenant of good faith and fair dealing in the Agreement, which have caused and will continue to cause MFSN a loss of goodwill and reputation, and a substantial loss of business.

## THIRD CAUSE OF ACTION

## Intentional Interference with Contractual Relations

114. MFSN repeats and realleges each and every allegation in Paragraphs 1 to 113 above as if fully set forth herein.

115. As part of its business, MFSN has valid and binding contracts with its over 100,000 customers under which MFSN's customers pay a subscription fee in exchange for the ability to access and aggregate their credit reports and other credit-related data on the MFSN platform.

116. ConsumerDirect knows that MFSN contracted with its customers because ConsumerDirect operates the same credit monitoring service as MFSN and is therefore familiar with the nature of MFSN's business. ConsumerDirect also knows that MFSN contracted with its customers because ConsumerDirect administered the MFSN white label platform and, as a result, has access to MFSN's confidential data. Through its access to MFSN's confidential data, ConsumerDirect knows each and every white label

customer with whom MFSN has a contract.

117. ConsumerDirect has intentionally disrupted MFSN's contractual relationships with its customers by disrupting MFSN's ability to migrate its customers onto its new platform and refusing to provide MFSN access to its customers' data.

118. ConsumerDirect has further intentionally disrupted MFSN's contractual relationships with thousands of its customers by using its control over the ConsumerDirect white label platform to make it increasingly difficult for MFSN's customers to cancel their accounts and transition to MFSN's new platform, while at the same time intentionally attempting to dissuade and coerce MFSN's customers from enrolling in MFSN's new platform and instead enrolling in ConsumerDirect's SmartCredit platform.

119. ConsumerDirect has further intentionally disrupted MFSN's contractual relationships with thousands of its customers by forcing MFSN's customers to reset their passwords on multiple occasions without any legitimate basis in order to frustrate and interfere with their relationship with MFSN. Upon information and belief, during this same period of time, ConsumerDirect did not impose these same onerous and disruptive requirements upon ConsumerDirect's own direct customers.

120. ConsumerDirect has further intentionally disrupted MFSN's contractual relationships with thousands of its customers by disabling or interfering with MFSN affiliates' access to key features that allow affiliates to provide credit-consulting services to MFSN's customers.

121. ConsumerDirect has further intentionally disrupted MFSN's contractual relationships with thousands of its customers by removing MFSN's Terms of Use from the MFSN white label webpage and requiring all current and new MFSN white label customers to consent to ConsumerDirect's unilaterally implemented Terms of Use.

122. Through its SmartCredit platform, ConsumerDirect directly competes with MFSN for credit monitoring service customers. By disrupting and destroying MFSN's contractual relationships with its customers and affiliates, ConsumerDirect

has fabricated, created and capitalized on an opportunity for its SmartCredit platform to increase its market share and customer base.

123. ConsumerDirect has deceived MFSN's customers into believing that MFSN provides an inferior and unreliable product by, among other things, unilaterally shutting down key features, forcing customers to reset their passwords, making it extremely difficult and onerous for customers to sign up for MFSN's new platform, and stating to MFSN's customers when those customers have taken steps to cancel the account housed by the ConsumerDirect platform that MFSN's new platform is inherently risky.

124. ConsumerDirect's conduct has amounted to a calculated scheme of unfair, deceptive, fraudulent, and anticompetitive business practices. ConsumerDirect has, without any legitimate business basis, intentionally leveraged its control over the white label platform—a platform whose purpose was to provide a beneficial service for MFSN—to hold MFSN's Customer Data hostage, hamper MFSN's ability to service its customers, and poison MFSN's customer relationships, all while ConsumerDirect simultaneously solicited MFSN's customers for its own SmartCredit platform.

125. MFSN has suffered and will continue to suffer irreparable and incalculable harm that cannot be cured solely by monetary damages because of ConsumerDirect's actions, which have caused and will continue to cause MFSN a loss of goodwill and reputation, and a substantial loss of business.

126. Further, MFSN has suffered substantial monetary harm in an amount to be determined at trial.

127. As part of its business, MFSN has valid and binding contracts with over 10,000 affiliates, under which MFSN's affiliates refer customers to MFSN in exchange for commission-based payments.

128. ConsumerDirect knows that MFSN contracted with its affiliates because ConsumerDirect operates the same credit monitoring service as MFSN and is therefore familiar with the nature of MFSN's business. ConsumerDirect also knows that MFSN

contracted with its affiliates because ConsumerDirect administered the MFSN white label platform and has access to MFSN's confidential data. Through its access to MFSN's confidential data, ConsumerDirect knows each and every affiliate with whom MFSN has a contract.

129. ConsumerDirect has intentionally disrupted MFSN's contractual relationships with its over 10,000 affiliates by disrupting MFSN's ability to migrate its customers onto its new platform and withholding MFSN's access to its customer's data. These disruptions have made it significantly more difficult for MFSN's affiliates to provide their services to their clients, and have therefore caused the affiliates to grow frustrated with MFSN and in some cases divert their business away from MFSN.

130. ConsumerDirect has further intentionally disrupted MFSN's contractual relationships with its over 10,000 affiliates by using its control over the ConsumerDirect white label platform to make it increasingly difficult for MFSN's customers to cancel their accounts and transition to the new platform, while at the same time dissuading MFSN's affiliates from enrolling their clients in the new platform and instead encouraging enrollment on SmartCredit.

131. ConsumerDirect has further intentionally disrupted MFSN's contractual relationships with its over 10,000 affiliates by disrupting affiliates' abilities to service their clients, specifically by forcing MFSN's customers to reset their passwords and disabling affiliates' access to external login APIs that are necessary for affiliates to provide credit-consulting services.

132. ConsumerDirect knew and intended that, by forcing all MFSN customers to reset their passwords, MFSN's affiliates would be unable to access their customers' credit reports and provide their credit-consulting services. ConsumerDirect additionally knew and intended that, by disabling affiliates' access to external login APIs that allowed them to use third-party software on the MFSN white label platform, MFSN's affiliates would be unable to provide their full spectrum of credit-consulting services to their customers.

133. ConsumerDirect has further intentionally disrupted MFSN's contractual relationships with its affiliates by directly soliciting certain of those affiliates, including by offering them discounts to divert their business to ConsumerDirect. ConsumerDirect has relied on the disruptions that ConsumerDirect itself has caused on the MFSN platform as its basis for encouraging MFSN's affiliates to terminate their relationships with MFSN.

134. Through its SmartCredit platform, ConsumerDirect directly competes with MFSN for credit monitoring service customers, as well as affiliates. By disrupting MFSN's contractual relationships with its affiliates, ConsumerDirect has created and capitalized on an opportunity for its SmartCredit platform to increase its market share and affiliate and customer base.

135. ConsumerDirect has deceived MFSN's affiliates into believing that MFSN provides an inferior and unreliable product by unilaterally shutting down key features and forcing customers to reset their passwords and claiming that MFSN's new platform is inherently risky.

136. ConsumerDirect's interference with MFSN's affiliate relationships was particularly damaging because affiliates are the lifeblood of MFSN's business model. MFSN spent fourteen years cultivating relationships with over 10,000 affiliates who refer their clients to MFSN's credit monitoring services. ConsumerDirect exploited its control over the white label platform to render the platform unusable for MFSN's affiliates and disable MFSN's affiliates' ability to service their clients, in turn poisoning MFSN's relationships with its affiliates and causing its affiliates to terminate or greatly reduce their relationships with MFSN and direct their business to competing platforms, including SmartCredit. ConsumerDirect also exploited its access to MFSN's confidential Affiliate Data to identify and target MFSN's most profitable affiliates. ConsumerDirect first disrupted the white label platform to make affiliates unable to service their clients, then used MFSN's own confidential data to solicit those same affiliates to switch to SmartCredit. This coordinated campaign has caused MFSN

a significant loss in market share and profits, and has resulted in the destruction of affiliate relationships and the business reputation that MFSN built over fourteen years.

137. ConsumerDirect's conduct reflects a coordinated effort to interfere with MFSN's affiliate relationships and constitutes unfair, deceptive, fraudulent, and anticompetitive business practices. ConsumerDirect has, without any legitimate business basis, intentionally leveraged its control over the white label platform—a platform whose purpose was to provide a beneficial service for MFSN—to disrupt MFSN's ability to provide the resources and functionalities it has promised affiliates, thereby poisoning MFSN's affiliate relationships, all while ConsumerDirect simultaneously solicited those same affiliates for its own SmartCredit platform.

138. MFSN has been damaged by ConsumerDirect's tortious conduct in an amount to be determined at trial.

139. MFSN has suffered and will continue to suffer irreparable and incalculable harm that cannot be cured solely by monetary damages because of ConsumerDirect's actions, which have caused and will continue to cause MFSN a loss of goodwill and reputation, and a substantial loss of business.

140. ConsumerDirect's conduct was willful, wanton, and malicious, and was undertaken with conscious disregard for MFSN's rights. MFSN is therefore entitled to punitive damages.

## <u>FOURTH CAUSE OF ACTION</u>

### <u>Intentional Misrepresentation</u>

141. MFSN repeats and realleges each and every allegation in Paragraphs 1 to 82 and 114 to 140 above as if fully set forth herein.

142. ConsumerDirect made multiple material misrepresentations to MFSN, each of which ConsumerDirect knew to be false at the time.

143. First, beginning in September 2025, ConsumerDirect, directly by its CEO, David Coulter, its CRO, Chris Peery, and through its attorneys, represented to MFSN that it needed a new contract to address regulatory and compliance concerns related to

ConsumerDirect's anticipated S-1 registration statement. This representation was false. ConsumerDirect's true intention was not to address compliance concerns, but to impose entirely new, restrictive business terms that would allow ConsumerDirect to recognize MFSN's customer revenue as its own, automatically enroll MFSN's customers into SmartCredit, lock MFSN into an exclusive three-year term, and eliminate MFSN's termination rights. ConsumerDirect knew that MFSN would not voluntarily agree to these onerous terms, so ConsumerDirect fabricated a compliance pretext to induce MFSN to engage in negotiations.

144. Second, in October 2025, ConsumerDirect, through its attorneys, fabricated a breach of contract allegation, claiming for the first time in the parties' nine-year relationship that MFSN had breached the Agreement by failing to include ConsumerDirect's policies on MFSN's landing page. This representation was false. Schedule G of the Agreement expressly provides that inclusion of ConsumerDirect's policies was "optional." ConsumerDirect knew this purported breach was baseless but used it as additional leverage to pressure MFSN into signing the new agreement.

145. Third, beginning in December 2025 and continuing through February 2026 and beyond, ConsumerDirect, through its attorneys, repeatedly manufactured baseless security concerns regarding the MFSN platform, representing to MFSN that these concerns were legitimate and that ConsumerDirect would stop imposing disruptive "security" measures and return MFSN's Customer Data once the concerns were addressed. These representations were false. ConsumerDirect fabricated each purported security concern as a pretext to justify its ongoing refusal to return MFSN's data and its continued disruption of the MFSN platform. Each time MFSN addressed a purported concern, ConsumerDirect simply invented new ones. Over time it became clear that ConsumerDirect never intended to return MFSN's data regardless of what security measures MFSN implemented, nor did ConsumerDirect ever intend to stop disrupting MFSN's white label platform.

146. Fourth, ConsumerDirect, through a letter from its attorneys, represented

to MFSN on December 7, 2025 that if MFSN obtained a third-party security attestation from a "reputable" data security firm, ConsumerDirect would cease its "preventative security measures" and cooperate with the data transfer. This representation was false. When MFSN engaged Kroll—one of ConsumerDirect's own preferred security firms—and Kroll's report confirmed that MFSN's platform had only minimal, remediated vulnerabilities, ConsumerDirect refused to sign the non-reliance agreement necessary to review the report, continued to raise new objections, and maintained its refusal to return MFSN's Customer Data. ConsumerDirect never intended to honor its promise to cooperate once MFSN obtained a security attestation.

147. Fifth, ConsumerDirect, through its attorneys, initially represented on February 3, 2026, that it would comply with its obligations under Section 8.4.1 of the Agreement and cooperate with MFSN's request to transfer MFSN's Customer Data. This representation was false. ConsumerDirect appeared receptive to complying with its contractual obligations, stringing MFSN along for months, before ultimately refusing to transfer the data and debilitating MFSN's ability to efficiently transition its white label customers to its new platform. ConsumerDirect never intended to return MFSN's Customer Data.

148. ConsumerDirect made each of these misrepresentations with knowledge of their falsity. ConsumerDirect knew that its stated compliance concerns were a pretext for imposing new business terms. ConsumerDirect knew that the purported breach regarding policy disclosures was baseless under Schedule G of the Agreement. ConsumerDirect knew that its security concerns were manufactured pretexts. ConsumerDirect knew that it had no intention of returning MFSN's data regardless of what security measures MFSN implemented or what attestations MFSN obtained.

149. ConsumerDirect made each of these misrepresentations with the intent to defraud MFSN. ConsumerDirect intended to deceive MFSN into engaging in prolonged good-faith negotiations rather than pursuing its legal remedies. ConsumerDirect intended to deceive MFSN into expending substantial time and

resources addressing fabricated security concerns. ConsumerDirect intended to deceive MFSN into hiring Kroll and investing in unnecessary security audits and remediation measures.

150. MFSN justifiably relied on ConsumerDirect's misrepresentations. Based on the parties' nine-year cooperative contractual relationship, during which ConsumerDirect had never raised any compliance, breach, or security concerns, MFSN had no reason to believe that ConsumerDirect was acting in bad faith. MFSN reasonably believed that ConsumerDirect's stated concerns were genuine and that ConsumerDirect would honor its contractual obligations and its representations regarding cooperation. MFSN could not have anticipated that ConsumerDirect would engage in a calculated effort to tarnish MFSN's market reputation and solicit MFSN's customers and affiliates while stringing MFSN along with false promises.

151. As a direct and proximate result of its reliance on ConsumerDirect's misrepresentations, MFSN has suffered substantial damages. MFSN engaged in months of good-faith negotiations rather than pursuing its legal remedies or alternative transition strategies sooner. MFSN expended substantial time and money hiring Kroll, addressing fabricated security issues, and implementing unnecessary security measures. MFSN delayed transitioning its customers to its new platform, during which time ConsumerDirect misappropriated a substantial portion of MFSN's customer base. MFSN lost valuable affiliate relationships that it had cultivated over fourteen years. MFSN has been damaged in an amount to be determined at trial.

152. MFSN has suffered and will continue to suffer irreparable and incalculable harm that cannot be cured solely by monetary damages because of ConsumerDirect's fraudulent conduct, which has caused and will continue to cause MFSN a loss of goodwill and reputation, destruction of business relationships built over fourteen years, and a substantial loss of business.

153. ConsumerDirect's fraudulent conduct was willful, wanton, and malicious, and was undertaken with conscious disregard for MFSN's rights. ConsumerDirect

engaged in deliberate deception over a period of many months, making repeated misrepresentations to induce MFSN's detrimental reliance while interfering with MFSN's customer and affiliate relationships and diverting those customers and affiliates to its own platform. MFSN is therefore entitled to punitive damages.

**<u>FIFTH CAUSE OF ACTION</u>**

**<u>Misappropriation of Trade Secrets — Affiliate Data (Federal Defend Trade Secrets Act and California Uniform Trade Secrets Act)</u>**

154. MFSN repeats and realleges each and every allegation in Paragraphs 1 to 113 above as if fully set forth herein.

155. MFSN owns an identifiable and protectable trade secret: its Affiliate Data. Under Sections 6.6 and 9.1 of the Agreement, MFSN is the exclusive owner of its list of affiliates and all affiliate-related information. This Affiliate Data consists of: (a) the private names and personal and professional contact information of each of MFSN's over 10,000 affiliates; (b) the revenue generated by each affiliate, including which affiliates were most profitable; (c) the number of customers enrolled through each affiliate; (d) referral history and customer retention rates for each affiliate; (e) subscription longevity of customers referred by each affiliate; (f) individualized promotional referral rates and incentive structures offered to specific affiliates; (g) the percent of each affiliate's customers that were refunded, suspended, or caused chargebacks or could not process payment; and (h) monthly metrics detailing each affiliate's number of re-activated accounts, suspended accounts, closed accounts, and new member enrollments. While certain affiliate names may be known in the marketplace, the economic value of MFSN's Affiliate Data lies in the compiled performance metrics and business intelligence that MFSN generated through years of labor—information that competitors and the outside world would not otherwise know.

156. MFSN's Affiliate Data derives independent economic value from not being generally known to the public or to MFSN's competitors. The compiled affiliate performance data—including profitability metrics, referral rates, customer quality, and

individualized incentive structures—provides significant competitive value because it identifies which affiliates generate the most revenue and customer referrals. This information would be highly valuable to any competitor seeking to recruit MFSN's top-performing affiliates. MFSN invested substantial time and resources in recruiting, developing, and cultivating relationships with its affiliates, and in compiling and analyzing the performance data that makes its affiliate network valuable.

157. MFSN has taken extensive measures to keep its Affiliate Data secret, private, and confidential. MFSN executed the Agreement requiring ConsumerDirect to maintain strict confidentiality of MFSN's affiliate information under Sections 6.6 and 9.1. Section 9.1 expressly prohibits ConsumerDirect from using MFSN's Confidential Information "to market, design, develop or produce products or services or to otherwise compete with [MFSN] in any manner." MFSN also required its affiliates to enter into confidentiality agreements protecting their relationship with MFSN. MFSN's Affiliate Data therefore constitutes trade secrets under both the Federal Defend Trade Secrets Act and the California Uniform Trade Secrets Act.

158. ConsumerDirect has improperly accessed, used, and continues to use MFSN's Affiliate Data trade secrets. ConsumerDirect obtained access to MFSN's Affiliate Data solely pursuant to the Agreement and subject to the confidentiality obligations therein. ConsumerDirect has violated those obligations by using MFSN's confidential affiliate information to identify and target MFSN's most profitable affiliates, and to solicit those affiliates to terminate their relationships with MFSN and instead refer their clients to SmartCredit. ConsumerDirect would not know which affiliates to target, or how to structure competitive offers to those affiliates, without its improper access to and use of MFSN's confidential Affiliate Data.

159. ConsumerDirect has further misappropriated MFSN's Affiliate Data trade secrets by refusing to return such data to MFSN. Despite MFSN's ownership of its Affiliate Data under the Agreement, and despite MFSN's demands that

ConsumerDirect return such data, ConsumerDirect continues to retain possession of MFSN's Affiliate Data and continues to use it for its own competitive purposes.

160. ConsumerDirect's misappropriation of MFSN's Affiliate Data trade secrets has unfairly and unlawfully enabled ConsumerDirect to gain market share while causing MFSN to lose significant market share. Ten of MFSN's top 50 affiliates have ceased doing business with MFSN as a direct result of ConsumerDirect's improper solicitation using MFSN's confidential Affiliate Data.

161. MFSN has suffered and will continue to suffer irreparable and incalculable harm that cannot be cured solely by monetary damages because of ConsumerDirect's misappropriation of MFSN's Affiliate Data, which has caused and will continue to cause MFSN a loss of goodwill and reputation, and a substantial loss of business.

162. MFSN has been damaged by ConsumerDirect's misappropriation of MFSN's Affiliate Data trade secrets and seeks (1) compensatory damages in an amount to be determined at trial for MFSN's actual losses and (2) disgorgement and return to MFSN the full amount of money and other benefits ConsumerDirect has received as a result of its misappropriation of MFSN's Affiliate Data, including unjust enrichment.

163. MFSN further seeks an order requiring ConsumerDirect to (1) cease all misappropriation and use of MFSN's Affiliate Data trade secrets and (2) return all Affiliate Data to MFSN.

164. ConsumerDirect's conduct was willful, wanton, and malicious, and was undertaken with conscious disregard for MFSN's rights. MFSN is therefore entitled to and additionally seeks punitive damages and attorneys' fees.

## SIXTH CAUSE OF ACTION

## Misappropriation of Trade Secrets — Customer Data (Federal Defend Trade Secrets Act and California Uniform Trade Secrets Act)

165. MFSN repeats and realleges each and every allegation in Paragraphs 1 to 113 and 154 to 164 above as if fully set forth herein.

166. MFSN owns an identifiable trade secret: its Customer Data. Under Section 6.6 of the Agreement, MFSN has "exclusive ownership of Partner Clients on ConsumerDirect Systems including all data pertaining to Partner Clients and Partner Prospects including any data including billing data." MFSN's Customer Data consists of: (a) full credit card information; (b) contact information including addresses, phone numbers, and emails; (c) Social Security numbers; (d) birthdays; (e) banking information; (f) billing and membership history; and (g) transaction history. This Customer Data is highly sensitive and personal information about MFSN's over 115,000 customers that is not known to the public or readily ascertainable.

167. MFSN's Customer Data derives independent economic value from not being generally known to the public or readily ascertainable to MFSN's competitors. MFSN invested substantial time, effort, and resources in acquiring its customers and compiling their data. This compiled customer information is essential to MFSN's business operations and would be highly valuable to any competitor—including ConsumerDirect—seeking to solicit MFSN's customers for competing credit monitoring services. In addition, access to the Customer Data would allow MFSN or any of its competitors to efficiently enroll MFSN's customers in a new platform without requiring those customers to re-enter their information. The value of this data lies not in the mere act of compiling spreadsheets, but in MFSN's years of labor in acquiring customers, building relationships, and maintaining detailed records of customer preferences, payment behavior, and service history.

168. MFSN has taken extensive measures to keep its Customer Data secret, private, and confidential. MFSN executed the Agreement requiring ConsumerDirect to maintain strict confidentiality of MFSN's customer information. Section 6.6 of the Agreement expressly provides that "[n]o use of Partner Client's Data or information shall be permitted by ConsumerDirect beyond those contained in this Agreement or reasonably necessary to fulfill ConsumerDirect's obligations to Partner under this Agreement without the express written consent of the parties." Section 9.1 further

prohibits ConsumerDirect from using MFSN's Confidential Information "to market, design, develop or produce products or services or to otherwise compete with [MFSN] in any manner." MFSN also hired a third-party security firm, Kroll, to ensure MFSN's platform is secure enough to protect the confidentiality of its customers' data. MFSN's Customer Data therefore constitutes trade secrets under both the Federal Defend Trade Secrets Act and the California Uniform Trade Secrets Act.

169. ConsumerDirect has improperly accessed and used, and continues to use MFSN's Customer Data trade secrets. ConsumerDirect obtained access to MFSN's Customer Data solely pursuant to the Agreement and subject to the confidentiality and use restrictions therein. ConsumerDirect has violated those obligations by using MFSN's confidential Customer Data to directly contact MFSN's customers, to dissuade them from enrolling in MFSN's new platform, and to solicit them to subscribe to ConsumerDirect's competing SmartCredit service. ConsumerDirect would not be able to contact MFSN's customers if not for its improper access to and use of MFSN's confidential Customer Data.

170. ConsumerDirect has further misappropriated MFSN's Customer Data trade secrets by refusing to return such data to MFSN. Despite MFSN's ownership of its Customer Data under the Agreement, and despite MFSN's formal demand on January 13, 2026 that ConsumerDirect return MFSN's Customer Data within twenty (20) days as required by Section 8.4.1 of the Agreement, ConsumerDirect continues to retain possession of MFSN's Customer Data and continues to use it for its own competitive advantage. ConsumerDirect continues to retain possession of MFSN's Customer Data despite its obligation to return it.

171. ConsumerDirect's misappropriation of MFSN's Customer Data trade secrets has unfairly and unlawfully enabled ConsumerDirect to gain market share while causing MFSN to lose significant market share. Each day ConsumerDirect continues to withhold MFSN's Customer Data, MFSN loses market share and ConsumerDirect gains market share. MFSN has only been able to retain 30% of its prior customers

from the white label platform, largely because ConsumerDirect's misappropriation has made it impossible for MFSN to effectively offer its new product to the majority of its customers.

172. MFSN has suffered and will continue to suffer irreparable and incalculable harm that cannot be cured solely by monetary damages because of ConsumerDirect's misappropriation of MFSN's Customer Data, which has caused and will continue to cause MFSN a loss of goodwill and reputation, and a substantial loss of business.

173. MFSN has been damaged by ConsumerDirect's misappropriation of MFSN's Customer Data trade secrets and seeks (1) compensatory damages in an amount to be determined at trial for MFSN's actual losses and (2) disgorgement and return to MFSN the full amount of money and other benefits ConsumerDirect has received as a result of its misappropriation of MFSN's Customer Data, including unjust enrichment.

174. MFSN further seeks an order requiring ConsumerDirect to (1) cease all misappropriation and use of MFSN's Customer Data trade secrets and (2) return MFSN's Customer Data to MFSN.

175. ConsumerDirect's conduct was willful, wanton, and malicious, and was undertaken with conscious disregard for MFSN's rights. MFSN is therefore entitled to and additionally seeks punitive damages and attorneys' fees.

## SEVENTH CAUSE OF ACTION

## Unfair Competition

176. MFSN repeats and realleges each and every allegation in Paragraphs 1 to 175 above as if fully set forth herein.

177. California Business and Professions Code section 17200 ("UCL") prohibits "any unlawful, unfair or fraudulent business practice." The UCL is a broad remedial statute designed to protect both consumers and competitors from unfair business practices that offend established public policy or are immoral, unethical,

oppressive, unscrupulous, or substantially injurious. The UCL provides an equitable remedy for conduct that, while it may not fit neatly into traditional tort categories, is nonetheless so inequitable and harmful that it demands judicial intervention.

178. ConsumerDirect's conduct, as described herein, represents a textbook case of "unlawful, unfair, and fraudulent business practice" under the UCL. ConsumerDirect leveraged a nine-year contractual relationship to obtain control over MFSN's customers and affiliates, raised pretextual security concerns to string MFSN along while diverting MFSN's customers and affiliates to itself, and systematically harming relationships MFSN had built over fourteen years of hard work and investment. Each element of ConsumerDirect's scheme—the breach of the Agreement, the intentional interference with MFSN's contractual relations, the misappropriation of MFSN's trade secrets, and the intentional misrepresentations made to MFSN, constitutes an independent violation of the UCL. But it is the totality of ConsumerDirect's conduct, and its sheer inequity, that makes this case cry out for the remedies the UCL was designed to provide.

179. Specifically, ConsumerDirect has engaged in unlawful, unfair, fraudulent, deceptive, and anticompetitive business practices by: (1) refusing to return MFSN's Customer Data while implementing measures that prevented customers from accessing MFSN's services; (2) manufacturing baseless security concerns as a pretext to delay returning MFSN's Customer Data while ConsumerDirect disrupted access to MFSN's platform so that ConsumerDirect could systematically divert MFSN's customers and affiliates to itself, thereby tarnishing MFSN's relationships and reputation in the industry; (3) stringing MFSN along for months with false promises of cooperation, inducing MFSN to expend substantial resources on unnecessary security audits and remediation measures, all while ConsumerDirect had no intention of returning MFSN's data; (4) weaponizing MFSN's own confidential data—data that ConsumerDirect was contractually obligated to protect and return—to contact, target, and solicit MFSN's customers and affiliates; (5) poisoning MFSN's relationships with its customers and

affiliates through deliberate sabotage of the MFSN white label platform, including multiple forced password resets, disabled APIs, and restricted customer support access; (6) implementing deceptive cancellation notices designed to frighten MFSN's customers away from MFSN's new platform and steer them toward SmartCredit; and (7) launching a social media campaign to disparage MFSN and further poison its business relationships.

180. ConsumerDirect's conduct was not merely a breach of contract; it was an orchestrated campaign to undermine MFSN's business. ConsumerDirect abused the trust MFSN had placed in it over nine years of cooperative contractual relationship. When MFSN refused to sign a new contract that would have allowed ConsumerDirect to claim MFSN's customers for itself to inflate ConsumerDirect's valuation for its anticipated public offering, ConsumerDirect retaliated with a scheme designed to accomplish through force and deception what it could not achieve through negotiation. ConsumerDirect's conduct was a coercive ultimatum: agree to our terms or we will destroy your business.

181. The inequity of ConsumerDirect's conduct is substantial. MFSN invested fourteen years building relationships with its affiliates and customers. MFSN developed its affiliate network through substantial investments of time, resources, and business acumen. MFSN trusted ConsumerDirect with its most sensitive business assets—its customer data, its affiliate information, and its platform—based on a nine-year partnership and the protections of the Agreement. ConsumerDirect misused that access to interfere with those relationships and divert MFSN's customers and affiliates for its own benefit. ConsumerDirect took what MFSN had earned.

182. The harm ConsumerDirect has caused cannot be measured solely in dollars. ConsumerDirect has poisoned affiliate relationships that MFSN cultivated through conferences, trainings, events, and personal attention. ConsumerDirect has destroyed goodwill that MFSN built through reliable service and fair dealing. The damage ConsumerDirect has inflicted on MFSN's business reputation may take years

to repair—if it can be repaired at all. This is precisely the type of conduct the UCL was designed to address: unfair business practices that cause harm beyond what traditional damages can remedy.

183. MFSN has been damaged by ConsumerDirect's unlawful, unfair, and fraudulent business practices and seeks compensatory damages in an amount to be determined at trial.

184. MFSN has suffered and will continue to suffer irreparable and incalculable harm that cannot be cured solely by monetary damages because of ConsumerDirect's actions, which have caused and will continue to cause MFSN a loss of goodwill and reputation, destruction of business relationships built over fourteen years, and a substantial loss of business.

185. Pursuant to California Business and Professions Code section 17203, MFSN seeks an order requiring ConsumerDirect to: (1) cease all such acts of unlawful, unfair, or fraudulent business practices; (2) disgorge and return to MFSN the full amount of money and other benefits ConsumerDirect has received as a result of such business practices, including all profits derived from customers and affiliates stolen from MFSN; (3) disclose the identity and contact information of all former MFSN customers and affiliates that signed up for any ConsumerDirect service on or after September 2025; and (4) terminate ConsumerDirect's relationships and accounts with all former MFSN customers and affiliates that ConsumerDirect improperly solicited and enrolled.

## EIGHTH CAUSE OF ACTION

### Declaratory Judgment

### (28 U.S.C. § 2201)

186. MFSN realleges and incorporates by reference the allegations contained in Paragraphs 1 to 140 and 154 to 185 above as if fully set forth herein.

187. An actual, present, and justiciable controversy exists between MFSN and ConsumerDirect as to (1) MFSN's ownership and right to transfer its Customer Data,

(2) ConsumerDirect's breaches of Sections 6.6, 8.4.1, 9.1, and 9.3 of the Agreement, (3) ConsumerDirect's intentional interference with MFSN's customer relationships, and (4) ConsumerDirect's misappropriation of MFSN's confidential Customer Data and Affiliate Data in an unfairly competitive manner.

188. MFSN contends that ConsumerDirect's actions have been an anticompetitive, concerted effort to solicit MFSN's customers and affiliates in breach of the Agreement.

189. ConsumerDirect's pretext is that security concerns are the reason for its unfair and improper actions, including its continued disruption of MFSN's client platform and refusal to provide MFSN with its Customer Data.

190. MFSN desires a judicial determination and declaration of MFSN's and ConsumerDirect's respective rights and duties under the Agreement, common law, and under California and Federal law.

191. Specifically, MFSN seeks a determination that: (1) MFSN is the true and lawful owner of its Customer Data, (2) ConsumerDirect has breached the terms of the Agreement by withholding MFSN's Customer Data, (3) ConsumerDirect's breach of the Agreement was an intentional and anticompetitive effort to disrupt MFSN's business and solicit MFSN's customers, and (4) ConsumerDirect's breach has caused a substantial and incalculable loss of MFSN's contractual relationships with customers and affiliates, business relationships, reputation, and goodwill.

## NINTH CAUSE OF ACTION

## Conversion

192. MFSN repeats and realleges each and every allegation in Paragraphs 1 to 153 and 176 to 191 above as if fully set forth herein.

193. Under the Agreement, MFSN is the owner of its data, including its Customer Data, and has a right to possession of this data.

194. ConsumerDirect has wrongfully refused to deliver and return MFSN's Customer Data to MFSN.

195. ConsumerDirect has improperly and unlawfully used MFSN's confidential Customer Data for its own competitive purposes.

196. MFSN has been damaged by ConsumerDirect's conversion of MFSN's Customer Data in an amount to be determined at trial.

197. MFSN has suffered and will continue to suffer irreparable and incalculable harm that cannot be cured solely by monetary damages because of ConsumerDirect's actions, which have caused and will continue to cause MFSN a loss of goodwill and reputation, and a substantial loss of business.

198. ConsumerDirect's conduct was willful, wanton, and malicious, and was undertaken with conscious disregard for MFSN's rights. MFSN is therefore entitled to punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, MFSN respectfully prays that the Court:

A. Find that ConsumerDirect is in breach of the Agreement between MFSN and ConsumerDirect;

B. Find that ConsumerDirect is in breach of the Agreement's implied covenant of good faith and fair dealing;

C. Find that ConsumerDirect intentionally interfered with MFSN's contractual relationships with its affiliates and customers;

D. Find that ConsumerDirect is liable for intentional misrepresentation, and that ConsumerDirect is liable for compensatory and punitive damages arising from its fraudulent conduct;

E. Find that ConsumerDirect is liable for violating the UCL, and enjoin ConsumerDirect from continuing its breach of the Agreement and/or the implied covenant of good faith and fair dealing and is liable for restitution and/or disgorgement;

F. Find that ConsumerDirect is liable for misappropriating MFSN's trade secrets in violation of the Federal Defend Trade Secrets Act, and that ConsumerDirect is liable for damages, including (1) actual and compensatory damages, (2) unjust

enrichment and disgorgement of any profits and benefits derived from such misappropriation, and (3) exemplary and punitive damages as well as attorneys' fees for ConsumerDirect's willful, wanton, and malicious behavior with conscious disregard for MFSN's rights;

G. Find that ConsumerDirect is liable for misappropriating MFSN's trade secrets in violation of the California Uniform Trade Secrets Act, and that ConsumerDirect is liable for damages, including (1) actual and compensatory damages, (2) unjust enrichment and disgorgement of any profits and benefits derived from such misappropriation, and (3) exemplary and punitive damages as well as attorneys' fees for ConsumerDirect's willful, wanton, and malicious behavior with conscious disregard for MFSN's rights;

H. Find that ConsumerDirect is liable for conversion of MFSN's Customer Data, and that ConsumerDirect is liable for damages, including (1) actual and compensatory damages, (2) unjust enrichment and disgorgement of any profits and benefits derived from such misappropriation, and (3) exemplary and punitive damages as well as attorneys' fees for ConsumerDirect's willful, wanton, and malicious behavior with conscious disregard for MFSN's rights;

I. Declare that MFSN is entitled to its Customer and Affiliate Data and information;

J. Grant a permanent injunction:

1. Ordering that ConsumerDirect transfer MFSN's Customer Data and Affiliate Data to MFSN;
2. Enjoining ConsumerDirect from using MFSN's Customer Data and Affiliate Data to contact or solicit MFSN's affiliates and customers;
3. Ordering ConsumerDirect to disclose the identity of all former MFSN customers and affiliates that signed up for any ConsumerDirect service on or after September 2025; and
4. Ordering ConsumerDirect to terminate its relationships and accounts with

all former MFSN customers and affiliates that signed up for any ConsumerDirect service on or after September 2025;

K. Recovery of general and compensatory damages according to proof;

L. Recovery of exemplary and punitive damages according to proof for ConsumerDirect's malicious, fraudulent, oppressive, and despicable conduct, undertaken with willful, conscious, wanton, and reckless disregard for MFSN's rights;

M. Recovery of attorneys' fees, litigation expenses, and costs of suit incurred by MFSN in this action pursuant to the Agreement, the Federal Defend Trade Secrets Act, the California Uniform Trade Secrets Act, and all other applicable law;

N. Recovery of pre-judgment and post-judgment interest in the maximum amounts provided by law on all damages, attorneys' fees, and costs;

O. Enter judgment in favor of MFSN and against ConsumerDirect for all sums owed, together with all gains, benefits, and advantages derived from ConsumerDirect's wrongful conduct;

P. Award MFSN restitution of all amounts acquired by ConsumerDirect by means of the wrongful acts described herein; and

Q. Grant such other and further relief as this Court may deem just and proper or that the interests of justice may suggest.

Dated: June 16, 2026

Respectfully submitted,

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, AND POPEO P.C.

By: */s/ James M. Wodarski*

James M. Wodarski
Nada I. Shamonki
Nadia A. Zivkov
Scott T. Lashway
Aaron R. Megar

Attorneys for Plaintiff,
MYFREESCORENOW Inc.

## DEMAND FOR JURY TRIAL

Plaintiff MFSN hereby demands a trial by jury.

Dated: June 16, 2026

Respectfully submitted,

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, AND POPEO, P.C.

By: */s/ James M. Wodarski*

James M. Wodarski
Nada I. Shamonki
Nadia A. Zivkov
Scott T. Lashway
Aaron R. Megar

Attorneys for Plaintiff,
MYFREESCORENOW Inc.